FILED
11/04/2021
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 4, 2021 Session

## STATE OF TENNESSEE v. BENJAMIN BARTON

**Appeal from the Criminal Court for Shelby County**
No. 17-02023    James M. Lammey, Judge
_____

### No. W2020-01273-CCA-R3-CD
_____

A jury convicted the Defendant, Benjamin Barton, of driving under the influence of an intoxicant ("DUI"), driving with a blood alcohol level in excess of 0.08 percent ("DUI per se"), and reckless driving. The trial court sentenced him to an effective sentence of eleven months and twenty-nine days, with six months to be served in confinement. The Defendant moved for a new trial and for the trial court to reconsider his sentence under Tennessee Rule of Criminal Procedure 35, and the motions were denied. On appeal, the Defendant asserts that the evidence is insufficient to sustain the verdicts, that he is entitled to a mistrial due to a discovery violation regarding expert testimony on retrograde extrapolation, that the trial court abused its discretion in failing suspend his sentence due to his health, and that there are errors on the judgment forms. We conclude that the Defendant is not entitled to relief on his convictions but that the sentencing forms are in conflict with the trial court's oral judgments, and we remand for the trial court to correct the forms.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Case Remanded

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Joshua Turner (on appeal and at trial) (pro hac vice), Oxford, Mississippi; and Janet Davis Lamana (on appeal), Memphis Tennessee, for the appellant, Benjamin Barton.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Vanessa Murtaugh, Kenya Smith, and Glenn Baity, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with DUI, DUI per se, and reckless driving after he collided with a cable barrier and law enforcement discovered him, intoxicated and in possession of half a bottle of tequila, by the side of the road. The Defendant testified at trial that he did not consume any alcohol until after the collision.

During opening statements, defense counsel told the jury that the proof would show that the Defendant collided with the cable barrier only after hitting some debris in the road and that he did not open the bottle of tequila until after the accident, when his truck was no longer operational. The State responded that the proof would establish the elements of the offenses charged.

Officer Michael Hillin of the Collierville Police Department received a call from dispatch about a red truck driving erratically on State Route 385 at "approximately 1:30-ish in the afternoon" on May 2, 2016. Officer Hillin stated that he was located near an entrance ramp and that he found the Defendant on the side of the road approximately three minutes after he received the call from dispatch. The Defendant's truck had damage to the driver's side, and both tires on the driver's side were flat. The Defendant was assembling a jack to try to replace one of the flat tires. He displayed signs of intoxication, including watery and bloodshot eyes, swaying, unsteadiness, confusion, and disorientation. He smelled of alcohol. Officer Hillin inventoried the Defendant's vehicle at the conclusion of the traffic stop, and he found a half of a bottle of tequila. He also found a Yeti cup full of a beverage that smelled of alcohol. The State introduced videos of the traffic stop, but these videos are not part of the appellate record.

On cross-examination, Officer Hillin testified that the Defendant's vehicle was inoperable after the accident and that the vehicle was so damaged that it would be a crime to drive it. He could not testify regarding how the Defendant came to collide with the guardrail, and he agreed that hitting an object in the road could cause loss of control. He stated he could not contradict the assertion that the Defendant hit a railroad tie in the road. Officer Hillin also acknowledged that he could not testify regarding whether the Defendant displayed signs of intoxication at the time he was actually driving or whether the Defendant was drinking alcohol while driving the vehicle. He agreed he had no proof regarding when the Defendant started drinking.

On redirect examination, Officer Hillin testified that he did not see any debris in the roadway and that the Defendant did not say the accident was caused by debris in the

- 2 -

road.  Officer Hillin asked the Defendant if he had hit the cable barrier, and at first the Defendant said nothing but later admitted to hitting it.

Collierville Police Officer Aaron Pitman was the second officer on the scene and arrived at approximately 2:10 p.m., or a little earlier.  The Defendant exhibited signs of intoxication, including slurred speech and unsteadiness on his feet.  Officer Pitman conducted field sobriety tests, which the Defendant failed.  The Defendant consented to a blood draw, and Officer Pitman was present for the blood draw and sealed the sample for analysis.  He did not recall the Defendant saying that there was debris in the road.

On cross-examination, Officer Pitman testified that the Defendant's vehicle was damaged and that Officer Pitman was not sure it was operable.  He agreed he did not witness the Defendant driving or hitting the guardrail and that his testimony could not establish that the Defendant did not hit a railroad tie.  Officer Pitman also could not testify that the Defendant was drinking while he was operating the vehicle.  Defense counsel asked Officer Pitman if he could testify regarding what the Defendant's blood alcohol level was while the Defendant was driving, and Officer Pitman responded that he could not.

Officer Edgar Morris, a crash reconstructionist for the Collierville Police Department, was responding to another accident when he received the initial call about the erratic vehicle, and he arrived at the scene approximately fifteen to thirty minutes later.  En route to the location of the truck, he saw the area where the cable barrier had been damaged, and the damage to the Defendant's vehicle was consistent with having struck the barrier.  He testified that there was some debris on the shoulder of the road near the impact site but that the roadway itself was free of any debris or hazards.  The Defendant did not mention any debris in the roadway and acknowledged having struck the barrier.  The Defendant had bloodshot eyes and "mush-mouth" speech, and he smelled of alcohol.

On cross-examination, Officer Morris agreed that the vehicle had flat tires and damage and that driving the vehicle would be a safety hazard.  He agreed he could not swear that the Defendant did not hit a piece of debris.  He did not witness the Defendant driving and accordingly could not say whether the Defendant displayed signs of intoxication while he was driving or whether the Defendant was drinking while he was driving.

Special Agent Julian Conyers of the Tennessee Bureau of Investigation testified as an expert in the field of forensic toxicology.  The Defendant's blood was collected at 3:13 p.m., and the alcohol content was 0.175 gram percent.  Special Agent Conyers stated that

the consumption of alcohol increases reaction time, slows processing, and interferes with judgment.

The prosecutor asked Special Agent Conyers if he could say what the Defendant's blood alcohol content would have been at 1:49 p.m., and the defense objected to retrograde extrapolation of the blood alcohol content, noting that the defense had received no notice or discovery regarding the testimony. The State responded that it had no written report regarding the proposed testimony and that there was accordingly nothing to provide in discovery. The trial court overruled the objection, observing that such a question could have been reasonably anticipated. The defense asked for a mistrial, which was denied. Special Agent Conyers testified that the accepted elimination rate is 0.01 gram percent to 0.02 gram percent per hour and that the range of alcohol in the Defendant's blood would have been between 0.185 and 0.205 gram percent at 1:49 p.m.

On cross-examination, Special Agent Conyers stated that his testimony did not constitute retrograde extrapolation because "there are several variables that are not known to perform a retrograde extrapolation." Instead, his testimony had concerned "elimination rate," which was a range and was not specific to an individual. Elimination rate among individuals did not vary by weight but did vary by metabolism. Special Agent Conyers stated that while there might be outliers, "pretty much most people" would fall within the range. He agreed that he did not conduct a physical examination of the Defendant and stated, "I don't know anything prior to this sample was taken – taken in – in my possession." He testified that the range he gave for the Defendant's blood alcohol level was based on the assumption that the Defendant did not consume any alcohol after being stopped by the police, and he agreed that evidence of continued consumption of alcohol could affect his estimate. He also agreed that information regarding whether the Defendant had eaten could affect his estimate. On redirect examination, he clarified that the range he had given would account for different metabolisms.

The Defendant testified that he managed a company which provided electrical services. On May 2, 2016, the Defendant encountered severe stressors at work, including a contractor who caused a chemical fire underneath an occupied scissor lift. The Defendant responded by leaving work early, shortly after 1:00 p.m. He stopped by a liquor store and bought a bottle of tequila, intending to drink it at his home. The Defendant testified that he had not consumed any alcohol at the time he was driving down the highway. He stated he was driving behind a delivery truck in the left lane and could not see past the truck. At one point, the truck moved to the right, and he saw a piece of wood that he believed to be a railroad tie in the roadway. He did not have time to avoid hitting the piece of wood, and that collision caused him to veer off the roadway

and hit the cable barrier.  He then moved his truck to the right side of the road and came to a stop.

The Defendant testified that the truck was inoperable, with two damaged tires and what turned out to be $11,000 total damage.  When the truck came to a stop, he experienced chest pain and felt hot.  Because the Defendant's mother had died of a heart attack and because his brother had died of a heart attack in a truck at the side of the road, the Defendant feared that he, too, was having a heart attack.  He removed the keys from the truck and proceeded to drink "quite a bit" of tequila.  He then got out to evaluate the damage.  The Defendant, hoping to find a ride, sent a text message to a friend identified at trial as "Shawn."  The text message, which was sent at 1:46 p.m. and introduced as an exhibit at trial, asked Shawn how far he was from the Defendant's location and stated, "I had [a] flat and hi[t] the cable and truck not drivable.  I'm ok.  Ask DAVE who to call."  The Defendant testified he tried to call a tow truck, but the company with which he was familiar had closed, so he tried to contact his friend Mr. David Patterson to ask for a recommendation for a towing company.  The Defendant testified that he had been on the side of the road for four or five minutes when he sent the text message to Shawn.  The police arrived three minutes later.

The Defendant stated that he had not consumed any alcohol at the time he was driving.  He had his first drink on the side of the road, after his vehicle had been rendered inoperable.  He testified that he was changing his tire not because he intended to drive further but to prevent damage to the rear wheel during towing.  He agreed that by the time the police arrived, he had consumed alcohol.

On cross-examination, the Defendant stated he did not mention to police that he had only begun to drink after the collision because he was already intoxicated when police arrived.  Likewise, he did not mention the railroad tie or heart attack because he was intoxicated.  When asked why he replied in the negative when police asked him if he had been drinking, the Defendant stated he thought they asked if he had been drinking while driving.  He agreed that he initially lied to police when he told them he did not hit the guardrail.

The Defendant described opening the tequila and said he "turned it up and drank quite a bit of it."  He stated he drank half a bottle of tequila in three minutes.  When asked about the alcohol in the Yeti cup, he said, "I actually poured some into Coke or Diet Coke, whatever I was drinking that day, at the same time that I was drinking it."  He agreed he told Officer Pitman he was taking Xanax, and he stated that he understood the ramifications of taking Xanax and drinking but explained that he was trying to stop a heart attack.  He did not call 911 to report a potential heart attack because his cell phone had fallen to the floor, and by the time he retrieved it, he felt better.

On redirect examination, the Defendant testified that he took three separate medications for his heart condition. He was never asked by law enforcement if there was an obstruction in the road or if he had a heart condition. He stated he denied hitting the guardrail because his intoxication caused him to misunderstand the question.

The Defendant's friend Mr. David Patterson confirmed that the Defendant contacted him on the day of the accident seeking a tow truck recommendation. He acknowledged he was not present at the collision and could not testify about the accident.

The jury convicted the Defendant as charged. At the February 2020 sentencing hearing, the State argued that the Defendant had a history of previous criminal behavior. It particularly noted that, three years before the offense at issue, the Defendant had been convicted of DUI after he drove off the road and into a fire hydrant and attempted to leave the scene of the accident. It also noted a prior period of treatment for cocaine addiction. The defense argued that the Defendant was the manager of a company with twenty-two employees and that the entire company would be negatively impacted by his incarceration. The Defendant introduced medical records establishing that he had been diagnosed with HIV, which necessitated medication costing $4,000 each month, and that he suffered from a heart condition. Noting the crime was nonviolent and that the public would have to bear the cost of his medical treatment if incarcerated, he asked for probation or house arrest. The Defendant gave an allocution, asserting that he was not drinking and driving at the time he hit the cable barrier. He stated he was the only one who knew how to run the business he managed and that the twenty-two employees of the business would suffer if he had to be imprisoned.

The trial court did not credit the Defendant's statement that he did not drink until after the collision, noting that the assertion was a "bunch of fooey" and the Defendant would "have to think that I fell off the load of turnip[s]" to believe the statement. The court noted the importance of candor in sentencing. It merged the DUI and DUI per se convictions and sentenced the Defendant to eleven months and twenty-nine days, with six months to be served in confinement and the remainder of the sentence suspended. The trial court imposed a concurrent six-month sentence for the reckless driving conviction, and the judgment form reflects that this sentence was suspended.

The Defendant moved for a new trial, asserting that the evidence was insufficient, arguing that the State committed a discovery violation entitling him to a mistrial, and challenging the sentencing decision. After the advent of the COVID-19 pandemic, the Defendant filed an additional motion under Tennessee Rule of Criminal Procedure 35, asking the trial court to modify his sentence to probation or house arrest given his particular vulnerability to the virus due to his health conditions.

The trial court heard the motions on August 20, 2020. The trial court expressed interest in whether the virus was more or less prevalent in jail, and defense counsel responded only that the Defendant was particularly vulnerable. At the hearing, the Defendant testified that the electrical company had twenty-one employees most of whom worked "in the field." The Defendant stated that he worked out of an office on the site of a large warehouse, and only two other employees were regularly present at the warehouse site. He said he was isolating himself from these employees, working in part on weekends. He lived alone, used grocery delivery, and avoided all in-person social contact. He testified that his heart was currently operating at forty-four percent and that he was HIV positive. The Defendant stated that his employees would not be able to work without him managing the business. The prosecutor questioned the Defendant regarding whether he sanitized his groceries or pumped his own gas. The prosecutor argued the Defendant was "safer going into incarceration than he is going to Wal-Mart." The trial court continued the Rule 35 motion to allow the parties time to research whether the court had discretion to suspend the sentence.

In asking for a new trial, the defense argued that the evidence was insufficient in part because the Defendant's car was inoperable by the time he was intoxicated. Regarding the expert testimony, the defense argued that the prosecution only provided in discovery a one-page report which established the Defendant's blood alcohol content at the time the blood was drawn. Defense counsel asserted it was a discovery violation that the State did not provide the expert's anticipated testimony regarding retrograde extrapolation. The prosecutor asserted that she was unaware until the trial started that the Defendant intended to introduce proof that he consumed the tequila after the collision. Defense counsel told the court he did not recall if he had alerted the State to the theory of the defense. According to the prosecutor, the State "had to scramble" and reassess the toxicologist's testimony due to "this new theory" that the State was "just now learning about." The trial court denied the motion for a new trial, noting that the evidence was sufficient, that the State could not have anticipated the Defendant's assertion that he only began drinking after the collision, and that the State was entitled to respond to the defense's theory.

The court noted at the continued hearing that it had confirmed by reviewing opening arguments that the defense raised the issue regarding the timing of the alcohol consumption at the beginning of trial. Regarding the Rule 35 motion, the court concluded that the Defendant was required by statute to serve forty-five days at one hundred percent day-for-day, and ordered the forty-five days to be served "uninterrupted." It stated that, in order to provide some relief to the Defendant's business, it would order the remainder of the sentence of confinement to be served on weekends while the Defendant was on probation. The State clarified whether the

Defendant "has to do the 45 days on the weekend," and the court responded in the affirmative. The court then said, "The length of the sentence is…going to be the same, only it's going to be on weekends." The trial court also stated that the sentence was eleven months and twenty-nine days, and that the Defendant "shall be confined for a period of 6 months…with the balance suspended and placed on probation for a period of 10 months and 14 days…" Regarding the Defendant's medical vulnerability, the court noted that "[h]opefully," by the time the Defendant's appeal was concluded, a vaccine would be available.

## ANALYSIS

The Defendant appeals, asserting that the evidence is insufficient to support the convictions, that the State committed a discovery violation entitling him to a mistrial, that the trial court erred in ordering incarceration, and that the judgment forms are in conflict with the court's judgment. The State agrees that there is an error in the judgment forms but otherwise asserts that the Defendant is not entitled to relief.

### I. Sufficiency of the Evidence

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The DUI statute makes it "unlawful for any person to drive or to be in physical control of any automobile … on any of the public roads and highways of the state" while "[u]nder the influence of any intoxicant … that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess." T.C.A. § 55-10-401(1). DUI per se prohibits the same acts while "[t]he alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08%) or more." T.C.A. § 55-10-401(2).

The Defendant challenges his DUI convictions by arguing that witnesses did not see him actually driving while he was intoxicated and that the factors necessary to establish the alternate prong of "physical control" were not demonstrated by the State. *See State v. Carter*, 889 S.W.2d 231, 233 (Tenn. Crim. App. 1994) (citing *State v. Lawrence*, 849 S.W.2d 761, 765 (Tenn. 1993)). The Defendant conducts an analysis of the *Carter* factors regarding physical control by applying them to his circumstances after his vehicle was brought to a halt and rendered inoperable by the collision. This analysis is not pertinent to the theory under which he was convicted. The Defendant was not charged with DUI under the theory that, having innocently collided with the cable barrier, he drank half a bottle of tequila on the roadside and was subsequently in physical control of the vehicle. Instead, as the prosecutor explained during closing argument, the State was proceeding under the theory that the Defendant drove on State Route 385 while intoxicated, hit the cable barrier and damaged his vehicle as a result of his intoxication, and then lied under oath regarding the timing of his alcohol consumption. Whether the Defendant was in physical control of the vehicle after the collision is immaterial under the State's theory of the proof as it was presented to the jury at trial and in closing argument.

The proof at trial was uncontroverted that the Defendant was driving on the highway, that he hit the cable barrier, and that he was intoxicated when the police arrived. The only element in dispute was whether he was intoxicated at the time he was driving or whether he became intoxicated between the collision and the arrival of police. The Defendant presented testimony that he was not intoxicated while driving, that the collision was caused by debris in the road, and that he drank half a bottle of tequila after his vehicle came to a stop, causing him to be intoxicated at the time police arrived. However, the jury clearly rejected this testimony, relying instead on evidence which supports the inference that the Defendant was intoxicated while driving. This evidence includes the fact of the collision, the absence of debris from the roadway, the Defendant's statements to the police at the scene that he had not been drinking and did not collide with the cable barrier, the presence in the vehicle of both half a bottle of tequila and a Yeti cup with an alcoholic drink, the extent of the Defendant's intoxication at the time the police arrived, and the testimony regarding the very short interval between the collision and the arrival of police, which by the Defendant's own testimony was approximately

seven to eight minutes. We conclude that a rational trier of fact could have inferred that the Defendant was intoxicated prior to the collision.

The Defendant also asserts that evidence of his blood alcohol content, which was 0.175 gram percent at 3:13 p.m., approximately one and a half hours after the collision, was insufficient to support the conviction for DUI per se. He submits that a finding regarding his blood alcohol level at the time he was driving is speculation. The State cites to *State v. Greenwood*, in which the defendant argued that the State had failed to prove his blood alcohol content at the time he drove because it did not provide retrograde extrapolation testimony regarding his blood alcohol level. 115 S.W.3d 527, 531 (Tenn. Crim. App. 2003). The *Greenwood* court concluded that "a proper blood alcohol test administered at a reasonable time after the defendant has been driving, which reflects a blood alcohol content of [the statutory limit] or higher, constitutes circumstantial evidence upon which the trier of fact may, but is not required to, convict the defendant of DUI." *Id.* at 532-33. The *Greenwood* court further noted that the delay in testing and other factors may be introduced at trial by the defendant to attempt to establish that the test did not reflect the blood alcohol content at the time of the offense. *Id.* at 533. In *Greenwood*, this court concluded that a delay of fifty-five minutes for a blood draw was reasonable and that the jury could infer from the 0.12 percent result that the defendant's blood alcohol level was above 0.10 percent at the time he was driving. *Id.* Under *Greenwood*, we conclude that a rational trier of fact could have inferred that the Defendant's blood alcohol content was above 0.08 percent approximately one and one-half hours prior to the time his blood alcohol content was measured to be 0.175 percent.

The Defendant also challenges the sufficiency of the evidence to support the reckless driving conviction. "Any person who drives any vehicle in willful or wanton disregard for the safety of persons or property commits reckless driving." T.C.A. § 55-10-205. Willful or wanton conduct "'exceeds negligence in that the actor willfully breaches a duty,'" and the jury is entrusted with the determination of whether conduct was willful and wanton. *State v. Frederick John Schmitz, Jr.*, No. M2019-01254-CCA-R3-CD, 2021 WL 529360, at *4 (Tenn. Crim. App. Feb. 12, 2021), *no perm. app. filed* (quoting *State v. Wilkins*, 654 S.W.2d 678, 680 (Tenn. 1983)). The Defendant submits that there was no evidence to support the finding that he acted with a willful or wanton disregard for safety. The State responds that the act of driving while intoxicated is itself reckless. *See State v. Lawrence*, 995 S.W.2d 142, 145 (Tenn. Crim. App. 1998) (analyzing double jeopardy claim for DUI and reckless driving and concluding that "[t]hese offenses fail to meet the *Blockburger* test to qualify as the 'same offense' for double jeopardy purposes"); *see also State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012) (holding that double jeopardy claims should be analyzed under the *Blockburger* test). Here, there was evidence from which the jury could have inferred that the Defendant decided to drive after having consumed a half of a bottle of tequila; that he was extremely

intoxicated, with a blood alcohol content over twice the legal limit when it was measured one and a half hours later; that the roadway on which he was driving in the middle of the afternoon was clear of obstructions; and that he drove in such a manner that he veered off the clear roadway and collided with the cable barrier dividing his lane from opposing traffic. *See State v. Timothy Dean Martin*, No. 01-C-01-9609-CC-00393, 1998 WL 74351, at *5-6 (Tenn. Crim. App. Feb. 23, 1998) (blood alcohol content and alcohol consumption were pertinent to evaluating mens rea of recklessness under vehicular homicide statute). We conclude that, viewed in the light most favorable to the prosecution, the evidence is sufficient to support the conviction.

## II. Expert Testimony

The Defendant asserts that the trial court erred in permitting Special Agent Conyers to testify regarding elimination rate in order to approximate the Defendant's blood alcohol content at the time of the collision. He argues that the failure to provide discovery documents or notice regarding the elimination rate testimony was a discovery violation entitling him to a mistrial. The State responds that there was no discovery violation because Special Agent Conyers had not prepared a report on elimination rate, and it also argues that any error was harmless. The Defendant replies that the testimony was also inadmissible because it was speculative.

### A. Discovery

Tennessee Rule of Criminal Procedure 16 requires the disclosure of certain information, including "books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof" within the State's possession, custody, or control, when those items are material to preparing the defense, intended to be used in the case-in-chief, or were obtained from or belong to the defendant. Tenn. R. Crim. P. 16(a)(1)(F). Furthermore, the State must disclose certain scientific reports:

> (G) Reports of Examinations and Tests. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:
> > (i) the item is within the state's possession, custody, or control;
> > (ii) the district attorney general knows--or through due diligence could know--that the item exists; and
> > (iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

Tenn. R. Crim. P. 16(a)(1)(G). The State is under a continuing duty to disclose discoverable evidence. Tenn. R. Crim. P. 16(c).

On the other hand, "pretrial notice of expert testimony is not required by Rule 16." *State v. Lenardo DeWayne Spencer, et. al.*, No. M2016-01219-CCA-R3-CD, 2017 WL 2800147, at *8 (Tenn. Crim. App. June 28, 2017); *compare Stanfield v. Neblett*, 339 S.W.3d 22, 30 (Tenn. Ct. App. 2010) (requirements for disclosure under the Tennessee Rules of Civil Procedure); Tenn. R. Civ. P. 26.02(4) (requiring disclosure of an expert's anticipated testimony). In this case, the Defendant cannot point to an item discoverable under Rule 16 which the State did not disclose. It is undisputed that there were no tangible objects withheld from the defense and that the testimony at issue is not the result of a report or scientific test. This court has previously held that "if an expert may testify to information made known to them at trial, it logically follows that an expert may properly testify outside the exact contents of their Rule 16 report." *State v. Missy Daniella Lane*, No. E2017-01907-CCA-R3-CD, 2019 WL 4568053, at *24 (Tenn. Crim. App. Sept. 20, 2019), *perm. app. denied* (Tenn. Feb. 19, 2020). While a party may not seek to evade discovery by intentionally circumventing the creation of a report, *State v. Nichols*, 877 S.W.2d 722, 730 (Tenn. 1994), we do not think that the State here violated Rule 16.

The Defendant asserts that his due process rights were violated by the failure to disclose. *Compare Lavar R. Jernigan v. State*, No. M2019-00182-CCA-R3-PC, 2020 WL 4728117, at *9-11 (Tenn. Crim. App. Aug. 14, 2020) (the State's use of an undisclosed notebook was "unduly surprising and deprived trial counsel of an opportunity to prepare a defense"), *no perm. app. filed*; *with State v. Gilford E. Williams*, No. W1999-01556-CCA-R3-CD, 2001 WL 43176, at *3-5 (Tenn. Crim. App. Jan. 17, 2001) (rejecting the defendant's claim that due process was violated when the expert's reports did not contain his conclusions about whether the defendant's brakes were functional and the defendant was surprised at trial by the testimony and concluding in addition that any error was harmless). However, a defendant is generally not entitled to discovery of expert testimony which is introduced only to rebut prior evidence. *State v. Dellinger*, 79 S.W.3d 458, 489 (Tenn. 2002); *State v. Andrew Neal Davis*, No. M2002-02375-CCA-R3-CD, 2004 WL 1562544, at *16 (Tenn. Crim. App. July 9, 2004) (concluding that expert testimony was properly admitted without notice to rebut the defendant's testimony because "[i]n general, a defendant's request to discover the names of the State's witnesses does not apply to rebuttal witnesses"); *State v. Aucoin*, 756 S.W.2d 705, 714 (Tenn. Crim. App. 1988). This court has permitted expert testimony offered in the State's case-in-chief when the purpose of the evidence was to rebut evidence raise in the cross-examination of one of the State's witnesses, even though the defendant had no notice of the testimony. *Lenardo DeWayne Spencer, et. al.*, 2017 WL

- 12 -

2800147, at *8 (expert testimony was properly offered in response to the cross-examination of a witness, even though the State had not provided notice).

The prosecutor asserted at the hearing on the motion for a new trial that she was not aware until trial that the Defendant would try to establish that he only consumed the alcohol after the collision. She stated that the State "had to scramble" and decided to expand the toxicologist's testimony "because of this new theory" that the State was "just … learning about." Defense counsel did not contest the assertion that the prosecution was not made aware of the theory of the defense prior to trial. In opening statements, defense counsel told the jury that the defense anticipated proof that the Defendant did not open the bottle of tequila until after the collision, when his truck was no longer operational. During trial and prior to the expert's testimony, defense counsel asked Officer Pitman if he could testify regarding what the Defendant's blood alcohol level was while the Defendant was driving, and Officer Pitman stated that he could not.

We conclude that, because the Defendant questioned Officer Pitman about this exact topic – whether Officer Pitman could testify about the Defendant's blood alcohol level at the time he was driving – the testimony was, regardless of notice, properly admissible to rebut evidence raised by the Defendant. *See Lenardo DeWayne Spencer, et. al.*, 2017 WL 2800147, at *8.

## B. Admissibility

The Defendant also asserts that the testimony was merely speculative and should be deemed inadmissible due to a lack of reliability. Expert testimony must satisfy certain prerequisites to be admissible. *See State v. Phillip Michael Martinez*, No. W2019-02033-CCA-R3-CD, 2021 WL 2949514, at *11 (Tenn. Crim. App. July 14, 2021) (noting that the defense may have opened the door to the subject matter of proof regarding the victim's credibility, but concluding that the expert testimony offered on the subject must nevertheless be analyzed under the rules governing the admissibility of expert testimony). The trial court's rulings regarding the qualifications, admissibility, relevance, and competence of expert testimony are reviewed for abuse of discretion. *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Scott*, 275 S.W.3d 395, 404-05 (Tenn. 2009) (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

As part of its gatekeeping function, the trial court must make sure that the basis of an expert's opinion supports the expert's conclusions and that there is no "analytical gap"

- 13 -

between the expert's opinion and the data upon which the opinion is based. *Scott*, 275 S.W.3d at 402; *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). However, in the case before us, we conclude that the Defendant's argument regarding the admissibility of the evidence based on the assertion that it is speculative has been waived. At trial, Special Agent Conyers stated he had training regarding the rate at which alcohol metabolizes from the body, but he did not elaborate on the training he had received. The defense immediately objected to a failure to provide notice of the testimony regarding retrograde extrapolation and the failure to provide any discovery, and the State responded that there was no discovery which could have been provided. The Defendant moved for a mistrial on the basis of unfair surprise, and the trial court overruled the objection and denied the motion. Special Agent Conyers testified that, using the accepted elimination rate, he could give a range of between 0.185 and 0.205 for the Defendant's blood alcohol content at 1:49 p.m. He testified that the Defendant's blood alcohol level would have been higher prior to the blood draw, based on the assumption that the Defendant had not consumed alcohol after being put into custody and that he accordingly would be in the elimination phase. On cross-examination, he stated that he was not testifying to retrograde analysis but to elimination rate. According to Special Agent Conyers, elimination rate would depend on metabolism, but there were very few people who would fall outside the range he had estimated. He agreed he had never examined the Defendant and that he was not given anything related to the case other than a blood vial. Asked if he would agree that he had no knowledge of the Defendant's blood alcohol level when the Defendant was driving, Special Agent Conyers stated, "I don't know anything prior to this sample was taken – taken in – in my possession." He agreed that he did not know if the Defendant had had anything to drink after he was stopped by law enforcement and that he did not know if the Defendant had had anything to eat, and he agreed that these facts would affect his analysis. He did not know if certain heart medications would affect the analysis. He stated that he was present to testify to the blood alcohol content at the time the blood was drawn.

Accordingly, it appears that the Defendant only objected to the discovery issue at trial and did not challenge the admissibility of the testimony based on the analytical gap between the data, as it related to whether the Defendant's blood alcohol had peaked and he was in the elimination phase, and the expert's conclusions regarding the blood alcohol level. Absent an objection at trial, the issue is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Furthermore, the motion for a new trial only challenged the alleged discovery violation and asserted that the witness was not tendered as an expert in retrograde extrapolation. *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). In any event, the Defendant was able to elicit on cross-examination that

Special Agent Conyers could not testify to the Defendant's blood alcohol level while the Defendant was driving and that Special Agent Conyers's testimony had not taken into account variables which would affect the estimate, including the time the Defendant stopped drinking or whether he had eaten. Considering that one and a half hours after the collision, the Defendant's blood alcohol level, at 0.175 percent, was more than twice the legal limit of 0.08 percent, any error in admitting the testimony would have been harmless. Tenn. R. App. P. 36(b); *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008).

### III. Sentencing

The Defendant requests sentencing relief, citing to his pre-existing health conditions, the global pandemic, and the nonviolent nature of his offenses. The Defendant requests a sentence which does not involve incarceration in a penal facility. The State argues that the Defendant has waived this argument for failure to cite to authority and that the sentence was proper. The Defendant replies that the circumstance of a global pandemic is unprecedented and that there is accordingly no precedent to cite. We conclude that, under the record before us, the Defendant is not entitled to relief.

At the initial sentencing hearing, which took place prior to the arrival of the pandemic, the Defendant introduced proof that he was HIV-positive and suffered from a heart condition. The Defendant testified at the hearing on the Rule 35 motion regarding the precautions he was taking to avoid becoming ill with COVID-19. After initially sentencing the Defendant to serve six months in jail, the trial court reevaluated its sentence in light of the Defendant's supervisory role at his work, and sentenced the Defendant to serve forty-five contiguous days and the remainder of the six months on weekends. The court noted the Defendant's argument regarding COVID-19, but observed that the appellate process could be lengthy and "[h]opefully by the end they'll have a vaccine and things of that nature."

We agree with the Defendant that a global pandemic presents a unique set of circumstances. However, the Defendant is not the first inmate in Tennessee to seek lenity in sentencing based on a health condition. *See*, *e.g.*, *State v. Rick Allen Bowger*, No. E2008-01252-CCA-R3-CD, 2009 WL 1026088, at *2 (Tenn. Crim. App. Apr. 15, 2009) (denying relief on a sentence to confinement for misdemeanor assault and deferring to the trial court's "considerable latitude" in misdemeanor sentencing where the defendant argued his health conditions could lead to his demise in jail); *State v. Grady Hargrove*, No. 01C01-9102-CC-00041, 1993 WL 532627, at *2 (Tenn. Crim. App. Dec. 16, 1993) (affirming a sentence of incarceration when the trial court had concluded that the violent offense against a child required incarceration after the court considered proof that the

defendant "was in such ill health that medical testimony had indicated that incarceration and the stress resulting therefrom could in fact cause the defendant's death").

We agree with the State that the Defendant has not cited to any legal authority which would support overturning the trial court's sentencing decision. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Furthermore, while the record here contains proof of the Defendant's medical condition, there is no evidence regarding what, if any, precautions were being taken in the facility where the Defendant would be held in custody or what potential health outcomes the Defendant would face if incarcerated. *See Cameron v. Bouchard*, 815 Fed. App'x 978, 988 (6th Cir. 2020) (concluding that a preliminary injunction should be vacated because the section 1983 plaintiffs had not shown they were likely to succeed on the merits of their Eighth and Fourteenth Amendment claims because the jail had responded reasonably to the risk of COVID-19 transmission); *People ex rel. Gregor v. Reynolds*, 124 N.Y.S.3d 118, 124 (N.Y. Sup. Ct. 2020) (ordering the release on bail of a nonviolent, medically vulnerable inmate when the facility did not permit social distancing); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (noting that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' … proscribed by the Eighth Amendment"). On the record before us, we cannot conclude that the Defendant has shown that the trial court erred in its sentencing decision.

### IV. Judgment Forms

The parties agree that there is an error in the judgment form for the DUI conviction in Count 1.[1] The trial court initially sentenced the Defendant to eleven months and twenty-nine days, with six months to be served in confinement and five months and twenty-nine days to be served on probation. After considering the Defendant's Rule 35 motion, the trial court modified the sentence on September 3, 2020. The court stated that the Defendant would serve an uninterrupted forty-five days at one hundred percent but that the remainder of the sentence of confinement would be ordered to be served on weekends. There is some ambiguity in the hearing, as the State asked whether the Defendant "has to do the 45 days on the weekend," and the court responded in the affirmative, stating, "The length of the sentence is…going to be the same, only it's going to be on weekends." The trial court also at one point stated that the Defendant "shall be confined for a period of 6 months…with the balance suspended and placed on probation for a period of 10 months and 14 days…"

---

[1] The judgment form for Count 2, which merged with Count 1, is not included in the record on appeal.

The judgment initially showed a six-month period of incarceration and a subsequent five month, twenty-nine days of supervised probation. This sentence was altered on September 3, 2020, after the trial court granted relief on the Rule 35 motion, by crossing out the prior sentence and indicating the new sentence. The altered judgment reflected a period of forty-five days to be incarcerated at one hundred percent and a subsequent ten months and fourteen days of supervised probation. On the same day, the court entered an "Order Allowing Service of Sentence at Later Date," which ordered the Defendant's forty-five-day sentence to begin on March 3, 2021.[2] A separate "Order Allowing Non-Consecutive Sentence," which ordered non-consecutive service on the weekends of a sentence of six months to begin on April 23, 2021, was likewise entered. We noted in our order granting the Defendant's motion to stay his sentence pending appeal that the judgment form appeared to be in conflict with the trial court's oral ruling and that the "Order Allowing Non-Consecutive Sentence" reflected non-consecutive service of the entire six months and did not subtract the "uninterrupted" forty-five days which the accompanying "Order Allowing Service of Sentence at Later Date" required. The parties on appeal agree that the actual sentence imposed was for six months in confinement, with forty-five days to be served contiguously and the remainder of the six months to be served on weekends. We remand for correction of the judgment form in Count 1 and of the "Order Allowing Non-Consecutive Sentence" to accurately reflect the trial court's ruling, and for the entry of a judgment in Count 2. *See State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015) (noting that the best practice is to enter separate judgments for merged offenses).

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgments but remand for correction of the judgment forms and of the "Order Allowing Non-Consecutive Sentence" to conform with the trial court's oral rulings, and for entry of a judgment form in Count 2.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

_____

[2] This court granted a motion to stay the service of the Defendant's sentence pending the conclusion of the appellate process.

- 17 -